**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

**Civil Action No. 13-cv-01617-MSK-BNB**

**LOKEN-FLACK, LLC, and
LYNN LOKEN,**

      Plaintiffs,

v.

**NOVOZYMES BIOAG, INC.,**
      Defendant.

_____

**OPINION AND ORDER GRANTING NOVOZYMES' MOTION FOR SUMMARY
JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to cross-motions for summary judgment by the Plaintiffs **(# 35)**, and the Defendant **(# 38, 40)**. Each side filed responses **(# 42, 43)** and replies **(# 47, 48)** to those motions. Also pending are unopposed motions by both parties to restrict access **(# 34, 37, 53)** to certain filings and supporting exhibits.[1]

---

[1] After being advised that a parallel proceeding was pending between these parties before the U.S. Patent and Trademark Office ("USPTO"), raising precisely the same issues, this Court issued an Order to Show Cause **(# 50)** inquiring why this Court should not stay this action pending resolution of the matter by the USPTO. The Plaintiffs responded **(# 52)** that they had no objection to the Court issuing such a stay, but the Defendant opposed **(# 55, 56)** a stay, arguing (among other things) that deferring to the USPTO's resolution would unnecessarily delay conclusion of the dispute, and that the USPTO was proposing to apply a less stringent standard of review than that compelled by Federal Circuit precedent. Thereafter, the Plaintiffs moved to strike **(# 57)** the Defendant's response as a prohibited sur-reply in support of its summary judgment motion, and the Defendant responded **(# 58)** to the Plaintiffs' motion.

      In issuing the Order to Show Cause, the Court was merely attempting to ascertain whether there was a reason for the Court to continue to maintain what, by all appearances, is a proceeding entirely duplicative of the USPTO action; it had no intention of inviting additional briefing or inducing any expansion of the litigation. For the reasons set forth herein, the Court addresses the relation of this action to the pending USPTO proceeding. Because the Court has not considered the parties' responses to the Order to Show Cause for any other purpose, the Motion to Strike is denied as moot.

1

## FACTS

Defendant Novozymes Bioag, Inc. ("Novozymes") is the holder of U.S. Patent Number 8,357,631 ("the '631 patent"). The patent is issued in the names of Inventors Raymond Smith and Robert Osburn, based on a patent application they submitted in January 2007. The patent covers "compositions and methods for enhancing plant growth and crop yield in legumes and non-legumes."

For purposes of this matter, only a highly summarized explanation of the patented method is warranted. It is an effort to accelerate the process of "nitrogen fixation" in plants. Nitrogen fixation results when a plant releases chemicals called "flavinoids," that cause soil bacteria, known as "rhizobia" to release "nod factor" compounds. The nod factors cause the plant to form root nodules, the rhizobia take up residence in those nodules, and begin converting atmospheric nitrogen into a form that is more usable by the plants. Past efforts to enhance the nitrogen fixation process involved applying nod factors themselves or rhizobia to seeds or soil at the time of planting, rather than waiting form them to develop naturally.

The patented method focuses on a specific type of nod factor, known as "lipo-chitooligosaccharides" or, more conveniently, "LCOs." The '631 patent covers several methods in which LCOs are combined with various other compounds, including flavinoids, herbicides, or, as particularly relevant here, compounds known as "chitins" or "chitosans." Chitins are essential components of fungi and insects that harm plants, and plants exposed to chitosans produce chitin-degrading enzymes, thus protecting the plant. Thus, for example, Claim 1 of the '631 patent addresses "a composition for enhancing plant growth . . . comprising at least one [LCO] and one or more . . . chitins [or] chitosans."

The Plaintiffs here assert a single claim for "correction of inventorship" on the '631 patent, pursuant to 35 U.S.C. § 256. They contend that the listing of inventors should be modified to include Plaintiff Lynn Loken as a co-inventor, alongside Drs. Smith and Osburn. Because this claim turns on the circumstances of the invention of the patented method, the Court turns to the (limited) evidence in the record on that point.

Plaintiff Loken-Flack, LLC ("L-F") was the "marketing arm" of an entity[2] that sold an "organically derived colloids" (or "ODC") product consisting of chitinous compounds under the name "Beyond." Prior to L-F's development of Beyond and other ODC products, the use of chitin in agricultural applications was economically impractical; L-F made practical use of ODCs possible. The record reflects that in between 2001 and 2003, L-F was in contact with various manufacturers of products promoting plant growth, proposing to combine Beyond with the products made by those entities. However, it is apparently undisputed that none of those manufacturers' products were LCOs.

According to the Plaintiffs, Mr. Loken, one of L-F's principals, had conceived of the idea of combining Novozymes'[3] LCO product, known as "Optimize," with an ODC product as early as 2001 or 2002, after he had achieved some success from his combinings of ODC with other manufacturer's plant growth products. After learning of the particular chemical structure of Optimize (apparently in or about 2003), Mr. Loken decided to approach Novozymes to propose combining ODC with Novozymes' products. He contends that Novozymes was not previously aware of L-F's development of Beyond or the availability of an economically-practical chitin

---

[2] For practical purposes, the Court will treat L-F as both the manufacturer and marketer of the ODC products.

[3] At the time, Novozymes was known as "Nitragin, Inc." For purposes of clarity, the Court will refer to it at all times by the name "Novozymes," including substituting that name of "Nitragin" when quoting from exhibits.

product. He contends that he introduced Novozymes to the concept of combining and LCO product with an ODC product in or about March 2004, the date that Novozymes and L-F entered into a non-disclosure agreement. In ensuring months, Mr. Loken discussed with Novozymes representatives various concentrations of ODC to try.

Novozymes contends that Drs. Smith and Osburn conceived of the method described in the patent in October 2003 while working for Novozymes. Relying on the mostly on the Plaintiffs bearing the burden of proof, Novozymes has not offered a substantial discussion of the circumstances surrounding Drs. Smith and Osburn's invention of the method. Rather, it merely points out that in or about March 2004, when L-F contacted Novozymes to discuss its ODC product, Dr. Smith considered the possibility that Beyond could be a means by which he could reduce the LCO-chitin method he had already conceived of to practice, and that Novozymes therefore entered into a nondisclosure and materials supply agreement with L-F to begin tests. Novozymes disputes Mr. Loken's statement that he first conceived of a LCO-chitin combination in 2001 or 2002, as Novozymes' commercial LCO product, Optimize, was not released until January 2004. (Mr. Loken responds by positing that he may have been aware of the product during its field testing phases.) Novozymes points to Mr. Loken's deposition, in which he testified that he was not aware of Optimize's chemical composition, or even what an LCO was, until approximately 2005. Rather, Novozymes contends that Mr. Loken was simply a "salesman" for L-F, informing Novozymes of the availability, nature, and characteristics of its ODC product, but not contributing to the conception of a patentable LCO-chitin method.

## ANALYSIS

### A. Standard of review

The parties present the instant matter by means of cross-motions for summary judgment. Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment.  "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently."  *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another").

### B.  Governing law

35 U.S.C. § 256 provides that "whenever through error . . . an inventor is not named in an issued patent, the Director [of the USPTO] may . . . with proof of the facts and such other requirements as may be imposed, issue a certificate correcting the error."  Notwithstanding the statute's reference to "the Director," the statute provides a private right of action to challenge

inventorship, and that right may be vindicated in the federal district court.[4]  *MCV, Inc. v. King-Seeley Thermos Co.*, 80 F.2d 1568, 1570 (Fed. Cir. 1989).

Issuance of a patent creates a rebuttable presumption that the named inventors are the true and only inventors.  *Caterpillar, Inc. v. Sturman Industries, Inc.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004).  To overcome this presumption, the party seeking correction bears the burden of showing that he was a co-inventor.  *Id.*  To be a joint inventor, the party seeking correction must show that he "ma[d]e a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention."  *Id.*  "Conception" of an invention means "a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice," such that only "ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation."  *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).  It is not enough for the party to show that he explained to the named inventors "concepts that are well known in the current state of the art."  *Caterpillar*, 387 F.3d at 1377.  The conception analysis necessarily turns on "the inventor's ability to describe his invention with particularity." *Borroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).

The party seeking correction's burden is higher than normal: he must show his co-inventor status by clear and convincing evidence.  *Caterpillar*, 387 F.3d at 1377.  Moreover, he may not rely on his own testimony alone; he is required to supply sufficient corroborating evidence.  *Id.*  Corroborating evidence may take a variety of forms, such as contemporaneously-produced documents prepared by the putative inventor, circumstantial evidence about the

---

[4]  *MCV* suggests that resort to judicial determination comes only after the parties have first presented their dispute to the Director of the USPTO and failed to attain "consensus."  870 F.2d at 1570.  This Court will assume, without necessarily finding, that the parties' dispute over whether this action should be stayed pending USPTO consideration is indicative of a failure to reach consensus before the USPTO over the appropriate resolution.

inventive process, and oral testimony of someone other than the alleged inventor. *Ethicon*, 135 F.3d at 1461. The sufficiency of corroborating evidence is subject to a "rule of reason," in which the Court must consider the evidence in context, mindful of all of the facts and circumstances and surrounding evidence, and upon the making of any appropriate credibility determinations. *Ethicon*, *id.* at 1464 (affirming court's finding of sufficient corroboration made "after an extensive hearing") To the extent underlying factual issues can be appropriately resolved, the determination of inventorship presents a question of law. *Checkpoint Systems, Inc. v. All_Tag Sec., S.A.*, 412 F.3d 1331, 1338 (Fed. Cir. 2005).

### C. Merits

As noted above, the Court must consider cross-motions for summary judgment independently. Because the Court ultimately finds in favor of Novozymes here, it need only turn to that motion.

The touchstone of the inquiry is "conception" of the invention. Here, the "invention" is the notion of combining an LCO product with a chitin product to obtain a synergistic effect. The Court has some doubt that the Plaintiffs have shown that Mr. Loken actually conceived of the invention prior to his contacts with Novozymes, as, by definition, one cannot conceive of an invention of this type without first knowing what an LCO is. Asked whether he "kn[e]w what an LCO was" at the time he first learned about Novozyme's LCO product, Optimize, Mr. Loken answered "no." He was then asked "when did you learn what an LCO was? When did you first hear of LCOs?," and he responded "when I started investigating and working with [Novozymes]."

This evidence is not consistent with the narrative posited by the Plaintiffs: that Mr. Loken initiated contact with Novozymes to suggest a specific idea for an LCO/ODC combination. Mr.

Loken could not have been drawn to Novozymes' Optimize product because it was an LCO, thus fitting his idea of an LCO/ODC combination, as he did not even know at that time what an LCO was. Rather, the record instead suggests something more prosaic: Mr. Loken conceived of the idea of combining Optimize with ODC, not because Optimize was an LCO (and not because Mr. Loken conceived of a potential synergistic biochemical relationship between LCOs and chitins), but merely because Optimize was a prominent plant growth product. Mr. Loken had previously proposed combining L-F's ODC product with other plant growth products, such as Scott's Miracle-Gro product, Gustafson's Bio-Yield product, and Gustafson's Kodiak product. Thus, his proposal to also combine ODC with Optimize was simply because Optimize was another potentially complementary product, and not because of the unique chemical composition of Optimize or the peculiars of a perceived synergy between LCOs and chitins. But ultimately, the Court need not make such a broad finding because this matter is more easily resolved on a lack of adequate corroboration of the Plaintiff's key assertion: that Mr. Loken proposed combining LCOs and chitins in discussions with Novozymes in or about 2003.

The Plaintiffs' corroborating materials from the relevant time period consist primarily of listings of plant growth product manufacturers, including Novozymes, that L-F sought to contact. These records merely corroborate the undisputed fact that L-F had some communications with Novozymes during the 2003-2004 time period, but they do not memorialize the contents of those communications. Some evidence of the content of the communications is necessary, as Novozymes concedes that it had discussions with L-F- during this time period, but that those discussions merely consisted of L-F alerting Novozymes to the fact that L-F was selling a commercially-available chitin preparation. Without some evidence that the conversation in of

those calls included Mr. Loken[5] proposing an LCO/ODC combination to Novozymes, the Plaintiffs lack the necessary corroboration.

The first corroborating evidence of an actual conversation between L-F (through Mr. Flack) and Dr. Smith is an memo from Mr. Flack to Mr. Loken, arguably dated March 19, 2004. That note recites a "2d phone call from John [Hren, a Novozymes representative]" in which Mr. Hren stated that he had received a sample of ODC that L-F had sent, but Mr. Hren stated that he lacked the authority to "start a test" and "had to consult with others." Apparently, Mr. Hren had Mr. Flack call Dr. Smith (causing Mr. Flack to lament in his notes that "I started over!!"). Mr. Flack indicates that he spoke to Dr. Smith and that "Dr. Smith finally agreed to start a test. He suggested Optimize as the leading candidate for a Rhizo."[6]

Even when taken in the light most favorable to the Plaintiffs, this evidence is insufficient to corroborate the Plaintiffs' contention that Mr. Loken (arguably, through Mr. Flack) first suggested the notion of an LCO/ODC combination to Dr. Smith; it merely establishes that Mr. Flack and Dr. Smith had discussions about conducting a test that would involve Optimize (and presumably, L-F's ODC). The fact that the parties agreed to conduct such a test does not shed any light on the question of who first conceived of the idea of pairing and LCO and an ODC, much less how that notion was communicated. It does not, for example, refute Novozymes'

---

[5] The Plaintiffs' position is further weakened by the fact that most of the communications between L-F and Novozymes were conducted by Mr. Flack, not Mr. Loken. Indeed, the Plaintiffs' summary judgment motion does not identify a single instance of Mr. Loken speaking directly to Drs. Smith or Osburn. Yet the Plaintiffs have not offered any testimony from Mr. Flack himself about the contents of his communication with Novozymes.

[6] Novozymes has provided the affidavit of Dr. Smith, who gives his version of that call with Mr. Flack, which Dr. Smith places at in or about March 2004. Dr. Smith states that Mr. Flack inquired about whether Novozymes "would be interested in testing a combination of a 'Rhizo' and ODC and, if so, whether I could recommend a specific 'Rhizo.'" Dr. Smith states that he declined to make such a suggestion, knowing that a rhizobia/ODC combiation "would not work as well as the LCO (Optimize)/ODC combination that Dr. Osburn and I had previously invented," and that he "then disclosed" the LCO/ODC combination to Mr. Flack "pursuant to a Mutual Confidential Disclosure Agreement."

contention that Dr. Smith conceived of the LCO-chitin combination in 2003 but did not endeavor to actually test it until he was contacted by L-F and informed of the availability of L-F's commercial ODC preparation in 2004.

The Plaintiffs also point to a July 26, 2006 e-mail from Mr. Hren to an individual named Kyle Rushing, with the subject line reading "ODC (Chitosan): LCO Application Rate Ratio." The e-mail is in response to an unknown query, making its context somewhat opaque, but Mr. Hren states that Novozymes "has not performed any scientific step ladder rate research," and although he states that "we see combined benefits," he acknowledges that "I can't provide any better guidance than that." Near the end of the e-mail, Mr. Hren states "Up to present, we really threw in ODC more as a curiosity screen than a serious player."

The Plaintiffs seize on this statement as corroborating their contention that Novozymes began testing an LCO/ODC combination at the urging of Mr. Loken, rather than out of Dr. Smith's own conception of a potential benefit from the combination. But, once again, the e-mail does not sustain the weight that the Plaintiffs impose on it. It merely indicates that Novozymes did not initially expect the combination to show significant results, but it does not address the essential question of who conceived the idea of combining the two substances and when. It does not refute the possibility that Drs. Smith and Osburn independently conceived of a potential synergistic effect between LCO and ODC, but considered that testing in general (or, perhaps, the specific type of testing that Novozymes ultimately attempted, due to insufficient methodology or concerns about the characteristics of the test's components) might fail to demonstrate such an effect.

Simply put, the Court finds that none of the corroborating evidence supplied by the Plaintiffs is sufficient to carry their burden of showing, by clear and convincing evidence, that

11

Mr. Loken was the first to conceive of the idea of combining and LCO and a chitin, and that he conveyed that idea to Drs. Smith and Osburn (or even that the three men formulated the idea together, collectively). Certainly, the evidence corroborates the fact that L-F made contact with Novozymes and that the parties entered into a relationship by which Novozymes began testing a combination of Optimize and L-F's ODC, but the circumstances Mr. Loken's alleged initial conception of the idea and his first communication of it to Novozymes remains uncorroborated by any meaningful evidence beyond his own testimony. Consequently, the Court finds that the Plaintiffs have failed to come forward with evidence that, even taken in the light most favorable to them, would be sufficient to carry their burden under the heavy "clear and convincing" standard.[7] Accordingly, Novozymes' motion for summary judgment is granted.

### D. Motions to Restrict Access

Both sides have filed motions seeking to restrict public access to certain filings and supporting exhibits under D.C. Colo. L. Civ. R. 7.2. The Plaintiffs' motion **(# 34)** seeks to restrict nearly all of the Plaintiffs' exhibits in support of their summary judgment motion (exhibits reflecting L-F's proposals to other plant growth product manufacturers and Mr. Flack's list of contacts, among other things), stating only the bare conclusion that "the documents to be restricted discuss confidential information, some of which has been designated as highly confidential, attorneys' eyes only" and that "the material concerns products and experiments that

---

[7] This poses an interesting procedural question. Among the reasons that Novozymes gave for opposing a stay of proceedings in this matter pending the USPTO's determination was a belief that the USPTO would hold the Plaintiffs to a lower "preponderance of the evidence" standard. If that is indeed the case, this Court's finding, which the Court expressly makes clear is dictated by the considerable burden posed on the Plaintiffs by the more exacting "clear and convincing evidence" standard, should be afforded no preclusive and little persuasive effect by the UPSTO. It may be possible – although this Court makes no findings in this regard – for the USPTO to conclude that the Plaintiffs' corroborating evidence is sufficient to meet a "preponderance of the evidence" standard, even if, as this Court finds, it is not compelling enough to rise to the more exacting "clear and convincing" standard. Thus, this Court's resolution of this case may have no effect on the ongoing USPTO proceeding.

12

if disclosed to competitors of either the Plaintiffs or Defendant could be used to their detriment." The motion does not specify the sensitive information with any particularity, nor does it address the possibility of alternative measures short of restricting access.

Novozymes filed two motions **(# 37, 53)** seek to restrict access. The first seeks to restrict access to the entirety of its summary judgment motion and two exhibits in support (the full 41-page response by Novozymes to Plaintiffs' discovery requests and excerpts from Mr. Loken's deposition), arguing that the former "contains Highly confidential business information of a non-party to this case and one of [L-F's] direct competitors" and that the latter "contains information designated by Plaintiffs." (No further explanation of the particular information at issue is offered.) The second motion seeks to restrict access to the entirety of Novozymes' response to the Court's Order to Show Cause and an accompanying exhibit, again consisting of portions of Mr. Loken's deposition testimony. Novozymes states that the response and deposition excerpt "contain information designated *by Plaintiffs* as Confidential and/or Highly Confidential – Outside Counsel Eyes Only under the Protective Order" and that no alternative to restricted access is possible "because redaction would deprive the Court of the cited information." Once again, the motion does not identify the sensitive material in question with any particularity.

The Supreme Court acknowledged a common law right of access to judicial records in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978). This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system. *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002). Judges have a responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society." *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996). There is a presumption that documents essential to the judicial process are to be available to the public, but

they may be sealed when the public's right of access is outweighed by interests which favor nondisclosure. *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997). Such a showing is required to ensure public confidence in the judicial process. It is critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral arbiter. *Id.* at 814.

D.C. Colo. L. Civ. R. 7.2(B) imposes specific showings that a party seeking to restrict public access to a filed document must make: (i) a showing that "the interest to be protected . . . outweighs the presumption of public access"; (ii) identification of "a clearly defined and serious injury that would result if access is not restricted"; and (iii) an explanation why "no alternative to restricted access [such as redaction or summarization, among other things] will adequately protect the interest in question." In addition, the rule makes clear that "stipulates between the parties and stipulated protective orders with regard to discover, alone, are insufficient to justify restricted access." D.C. Colo. L. Civ. P. 7.2(B)(2).

Neither party's motions comport with this standard. The parties have addressed the privacy interests they invoke in only the most abstract and general terms, have offered no analysis of the public interest in access to the documents in question or sought to balance those two interests, have not identified anything more than highly conclusory and speculative injuries that might arise if access is not restricted, and have not meaningfully addressed the availability of alternatives to restricted access. For example, Novozymes' summary judgment motion cites to Exhibit C, its 41-page response to the Plaintiffs' discovery requests, three times in its summary judgment motion, with those citations referencing only four pages of the 41-page document. There is no reason why Novozymes could not have simply provided the four relevant pages and/or redacted the remaining 37, arguably ameliorating the need to restrict access.

In any event, having reviewed all of the relevant documents, this Court finds that none of the material for which restricted access is sought presents obvious risks of clearly-defined and serious injuries that will result if public access to the entirety of the record is permitted. For example, the "highly confidential business information" cited by Novozymes' motion as being found in its 41-page discovery response consists of three substantive paragraphs stating facts that are either set forth in pertinent detail in the '631 patent itself or recited in substantial part herein, with little apparent risk of harm to Novozymes or the unidentified "non-party to this case." Similarly, the fact that L-F made proposals to other plant growth product manufacturers more than a decade ago, as shown in some of the exhibits at issue here, seems unlikely to pose any particular risk of substantial harm to L-F if disclosed now. Accordingly, the Court finds that none of the parties' Motions to Restrict Access have merit, and the Court directs that all documents filed under restricted access in this matter be unrestricted.

## **CONCLUSION**

For the foregoing reasons, Novozymes' Motion for Summary Judgment **(# 38, 40)** is **GRANTED**. The Clerk of the Court shall enter judgment in favor of Novozymes and against the Plaintiffs on the sole claim in this action. The Plaintiffs' Motion for Summary Judgment **(# 35)** is **DENIED AS MOOT**. The parties' Motions to Restrict Access **(# 34, 37, 53)** are **DENIED** and the Clerk of the Court shall lift all access restrictions on Docket # 36, 38, and 54. The Plaintiffs' Motion to Strike **(# 57)** is **DENIED**.

Dated this 30th day of September, 2014.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge